981 F.2d 1245
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Carlos OYOLA-ROSA, Plaintiff, Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant, Appellee.
 No. 92-1810.
 United States Court of Appeals,
First Circuit.
 December 30, 1992
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO
 Raymond Rivera Esteves and Juan A. Hernandez Rivera on brief for appellant.
 Daniel F. Lopez Romo, United States Attorney, Jose Vazquez Garcia, Assistant United States Attorney, and Paul Germanotta, Assistant Regional Counsel, Department of Health and Human Services, on brief for appellee.
 D.Puerto Rico
 AFFIRMED.
 Before Breyer, Chief Judge, Torruella and Selya, Circuit Judges.
 Per Curiam.
 
 
 1
 In 1989, Carlos Oyola filed an application for Social Security disability benefits, alleging disability due to epilepsy, a nervous condition and back and neck pain. After a hearing, the Administrative Law Judge (ALJ) found that Oyola was not disabled at step five of the sequential evaluation process set out in 20 C.F.R. § 404.1520(f). The ALJ determined that Oyola's epilepsy was a severe impairment which precluded him from returning to his previous employment, but that Oyola did not have a disabling emotional or mental condition. He credited Oyola's allegations of pain to the extent that his pain would reduce his residual functional capacity from heavy to medium work. (Thus, he treated Oyola's pain as an exertional impairment.) Although the ALJ found that Oyola could not engage in work in which he would have to climb or balance,[1] drive, or be exposed to unprotected heights and moving machinery, he concluded that those nonexertional impairments did not significantly compromise Oyola's capacity for the full range of medium work. Using Rule 203.25 of the Medical-Vocational Guidelines (the Grid) in Appendix 2 of the regulations as a framework for his decision, he determined that Oyola was not disabled before his coverage expired. Oyola appealed the ALJ's denial of benefits to the district court, which affirmed the ALJ's decision, and then sought review in this court. We affirm.
 
 I. Severity of Alleged Disabilities
 
 2
 Oyola does not challenge the ALJ's determination that his epilepsy did not meet or equal the criteria in the Listing of Impairments in Appendix 1 of the regulations. He claims, however, that the ALJ failed to consider adequately his allegations of disabling pain, and argues that his medical record shows that he "constantly and persistently" complained of "severe disabling pain" to his examining physicians. In fact, the medical record shows that Oyola only occasionally complained of pain or of other medical problems that might have caused him pain. In 1978, he reported that he had cervical muscle spasms and foot lesions, and he was advised to rest for a week. In 1983, he complained of pain in his feet, in his muscles and joints, and specifically in his neck and back or shoulder, but no medication or course of treatment was prescribed. In 1984, he reported pain in his left anterior thorax, and, being diagnosed provisionally as having angina pectoris and muscular spasm, was prescribed medicine. He was reported stable when he left the hospital. Pain in his thorax recurred once again in mid-1985. Although the 1985 medical report is practically unreadable, it appears to indicate that medication was prescribed for Oyola's pain. Between mid-1985 and December 31, 1988, the expiration date of Oyola's coverage, the record contains no further report by Oyola of any kind of pain. In early 1988, Oyola reported that he felt "allright for now."
 
 
 3
 The ALJ did not specifically refer to this evidence of pain in his decision, but his failure to do so was not error under the circumstances. First, the medical records evidencing Oyola's reports of pain are not very probative. They indicate that Oyola complained of pain only sporadically and not at all after the middle of 1985. The reports of pain for 1984 and 1985 relate to chest pains which Oyola has not asserted is or was disabling, and which he does not claim arose out of his primary medical impairment, epilepsy. Second, the ALJ made clear at the outset of his decision that his task was to adjudicate only whether Oyola had a disability between February 26, 1988 and December 31, 1988.[2] (Two prior applications of Oyola relating to time periods between 1983 and early 1988 were denied and not appealed.) The evidence relating to pain suffered in prior periods was useful background for determining whether the pain suffered in the following period of time was disabling, Frustaglia v. Secretary of Health and Human Services, 829 F.2d 192, 193 (1st Cir. 1987), but was not itself dispositive.
 
 
 4
 Furthermore, the ALJ considered thoroughly Oyola's testimony at a hearing in 1990 as to the severity of his pain. At the hearing, Oyola testified that severe pain caused by injuries suffered during a seizure and by bone spurs and arthritis had caused him to stop working. The ALJ noted, correctly, that the record showed that Oyola's osteoarthritis and musculoskeletal complaints arose after expiration of his coverage. He also noted that Oyola appeared to be healthy and strong at the hearing. Nevertheless, he evaluated Oyola's subjective complaints of back pain and epilepsy-related pain under the factors listed in Avery v. Secretary of Health and Human Services, 797 F.2d 19 (1st Cir. 1986). Specifically stating that he was giving Oyola the benefit of the doubt, he credited those allegations, but only to the extent that he found that Oyola's alleged pain reduced his exertional capability from heavy to medium work. He did not find Oyola totally disabled by pain because the medical record showed that Oyola did not seek or follow consistent medical treatment for his epilepsy, nor did the record indicate that the medications he received were ineffective to control his epilepsy, that they should be changed, or that there were adverse side effects. His conclusion shows that the ALJ reviewed Oyola's medical records thoroughly, even if he did not specifically discuss the records evidencing Oyola's complaints in 1978, 1983, 1984, and 1985. On the basis of all of the above factors, we conclude that the ALJ properly reviewed the evidence relating to Oyola's alleged pain, and that his findings relating to pain were supported by substantial evidence.
 
 
 5
 Oyola alleges further that the ALJ cited only evidence favorable to the Secretary, disregarded the medical evidence of Oyola's disability, and based the disability determination on his own medical opinion. He provides no detail as to what evidence the ALJ allegedly disregarded, and does not describe in what respect the ALJ ignored the opinions of examining or consulting physicians, or based his disability determination on his own medical opinion. We have reviewed the ALJ's decision and the record and find no error of the kind Oyola has alleged. The ALJ considered carefully the evidence in the record which was favorable to Oyola, reviewing even medical conditions suggested by the record which Oyola himself did not claim were disabling. He determined that Oyola's epilepsy and pain constituted a "severe impairment" which imposed both exertional and nonexertional limitations on Oyola. His determination is supported by Oyola's testimony of pain and by the residual functional capacity assessments of Drs. Marxuach and Hernandez. There is no other relevant medical assessment of residual functional capacity in the record which would support further restrictions on Oyola's ability to work, or which would support a conclusion that Oyola was totally disabled. The functional capacity assessment by Dr. Rivera, upon which Oyola relies and which the ALJ excluded from his consideration, relates to Oyola's condition in 1989, after his coverage had expired, and the ALJ was fully justified in discounting that assessment.[3] In any event, the ultimate conclusion in Dr. Rivera's assessment agrees broadly with the assessments of Drs. Marxuach and Hernandez. Although Dr. Rivera states that, as of 1989, Oyola was an "[u]ncontrolled patient who comes frequently due to convulsions, receiving occasional traumas," and Dr. Hernandez had concluded that, as of December 1988, his seizures "had no frequency," Dr. Rivera did not find Oyola to be totally disabled or prohibit him from all work. She recommended only that Oyola "never[ ][be] alone or engage[ ] in work where he might be exposed to danger due to convulsions."
 
 
 6
 The record also supports the ALJ's conclusion that Oyola did not have a disabling mental condition. In February 1985, he was referred to the Bayamon Mental Health Center in connection with his application for social security benefits. The referral stated that Oyola was "going through an intense depressive episode that began five months ago," and that he was not sleeping well and had been sleepwalking. Nevertheless, Oyola was not admitted because he was found not to have a "mental disorder." The report of his visit records as a "diagnostic impression" that a neurological disorder could be ruled out. Although the report of a visit in August 1985 states that he had previously been diagnosed tentatively as having a "personality disorder" (the record does not include any report stating this diagnosis), at the date of the August visit he was found to be "in contact with reality" and "oriented." He was not admitted for treatment because "no major psych. pathology" was found. In October 1986, he visited the Mental Health Center again, complaining of sleeplessness and hallucinations. Although he was admitted to receive treatment at the Center as an outpatient and the examiner's "diagnostic impression" was that Oyola might have an "adjustment disorder" and a "histrionic personality," the record of his visit stated that he was "logical, coherent, [and] oriented." At what appears to be his next appointment, in January 1987, he was reported as not mentioning "anything that calls our attention." Records for the same day from the Department of Mental Health state that he missed his appointment there. Some days later he visited the Bayamon Mental Health Center without an appointment, complaining that he had had hallucinations, heard voices, and had memory problems. He stated that his medication helped him "but not enough." The record states that he was "logical, coherent, oriented, approachable, communicative", and does not appear to make any change in medication. Although the record of that visit shows that an appointment for April 1987 was made, the record contains no report of that visit or any subsequent visit by Oyola to the Center, nor is there any other record of any other treatment of Oyola for mental or emotional problems. Accordingly, it appears that Oyola did not receive treatment at the Mental Health Center or at any other facility after January 1987. Thus, for approximately the last two years of the coverage period (and the entire period to be adjudicated here), he received no treatment for his alleged nervous condition. Therefore, the record provides substantial evidence for the ALJ's conclusion that Oyola did not suffer from a disabling mental condition.
 
 II. Reliance on the Grid
 
 7
 After determining that Oyola could perform medium, unskilled work in which he would not have to climb or balance, drive or be exposed to unprotected heights or moving machinery, the ALJ concluded that Oyola could not perform his previous heavy work which exposed him to a "hazardous environment."[4]
 
 
 8
 Accordingly, the ALJ noted that the burden of proof shifted to the Secretary to show that there were other jobs existing in significant numbers in the national economy which he could perform, given his exertional and nonexertional impairments, age, education and work experience. He found that Rule 203.25 of the Grid indicated that Oyola could make a successful vocational adjustment because he was a younger individual with marginal education who could readjust to medium unskilled work activities.[5] Without the aid of vocational testimony, the ALJ used Rule 203.25 as a "framework" for his decision and concluded that Oyola was not disabled because his "capacity for the full range of medium work was not significantly compromised by his nonexertional conditions prior to the expiration of his coverage." As we noted in Ortiz v. Secretary of Health and Human Services, 890 F.2d 520, 524 n.4 (1st Cir. 1989) (per curiam), because the ALJ failed to take vocational testimony, he is deemed to have relied exclusively on the Grid to show that jobs that Oyola could perform existed in significant numbers in the national economy.
 
 
 9
 Oyola contends that the ALJ erred in relying exclusively on the Grid. He argues that his nonexertional limitations significantly compromised his ability to engage in the full range of medium work, so that the ALJ should have consulted a vocational expert before finding that he was not disabled. Although Oyola's argument has merit and this issue is a close one, we find that, under the circumstances of this case, it is not necessary to remand to the ALJ to take the testimony of a vocational expert.
 
 
 10
 In Ortiz, supra, we stated that an ALJ need not consult vocational experts if he determines that nonexertional limitations, even significant ones, do not significantly compromise the full range of work a claimant may be expected to perform at the relevant exertional level. See id. at 524 ("If a non-strength impairment, even though considered significant, has the effect only of reducing [a claimant's] occupational base marginally, the Grid remains highly relevant and can be relied on exclusively to yield a finding as to disability.") (footnote omitted). At the same time, we stated that "the more that occupational base is reduced by a nonexertional impairment, the less applicable are the factual predicates underlying the Grid rules, and the greater is the need for vocational evidence." Id. at 524-25.
 
 
 11
 In determining whether a nonexertional limitation significantly compromises the occupational base, we have sometimes analyzed the severity of the medical condition causing the nonexertional limitation.[6] See, e.g., Perez Torres v. Secretary of Health and Human Services, 890 F.2d 1251, 1254-55 (1st Cir. 1989) (per curiam). If we use this same analysis here, we would conclude that Oyola's nonexertional impairments did not significantly diminish his ability to perform the full range of work at the medium exertional level. Before his coverage expired, Oyola apparently received emergency treatment for symptoms of a possible seizure disorder only twice-in October 1983, where the provisional diagnosis ruled out an epileptic seizure, and in September 1987, where epilepsy was provisionally diagnosed.
 
 
 12
 Although Oyola had reported that he had suffered epileptic seizures since childhood and that he had been "suspended" from work due to the seizures, he had also reported that he had never been treated for the seizures. In October 1985 Oyola's seizures were reported to be under control, although he had lost his anticonvulsant medication and had not been taking it. Lay statements by Oyola's sister and sister-in-law in 1989 indicated that Oyola suffered seizures once a month, but that the seizures could be controlled for periods of up to four months, and that the most recent seizures observed were in April, August and September of 1989. The medical records and lay statements show that Oyola's epileptic condition did not meet or equal the criteria in the Listings, and Oyola has conceded that fact. See 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 11.02, 11.03 (to be presumptively disabled under the Listings, a claimant must suffer major seizures more frequently than once a month, and minor seizures more frequently than once weekly, despite following prescribed treatment for at least three months). Based on the record of treatment alone, and emphasizing that Oyola received no treatment for epilepsy at all in 1988, the period to be adjudicated here, we would have to conclude that Oyola's epilepsy did not manifest itself frequently enough to significantly compromise his ability to engage in the full range of medium work during the adjudicatory period.
 
 
 13
 Given the nature of the nonexertional limitations in this case, however, we are reluctant to rely on that kind of analysis. In Perez Torres and other cases, see, e.g., Heggarty v. Sullivan, 947 F.2d 990, 996-97 (1st Cir. 1991) (per curiam) (evaluating the claimant's poor manual dexterity in light of the importance of fine motor skills to jobs at the sedentary exertional level); Ortiz, supra, 890 F.2d at 525 (evaluating the claimant's bending restriction in light of the bending requirements for light work), the specific nonexertional limitations in question diminished the claimant's ability to perform certain kinds of physical or mental tasks. As a result, analyzing the severity of the physical or mental condition giving rise to the nonexertional limitation truly captured the degree to which the nonexertional limitation affected the claimant's ability to perform the full range of work at the requisite exertional level. In contrast, Oyola's nonexertional limitations consist of environmental restrictions which preclude him from performing whole categories of jobs-he cannot perform any job that requires him to drive, to be near moving machinery, or to be exposed to unprotected heights (which, for purposes of our discussion here, we find subsumes Oyola's climbing and balancing limitations).[7]
 
 
 14
 Under these circumstances, we believe that the better way to determine whether Oyola's nonexertional limitations significantly reduce his occupational base would be to attempt to quantify in some way the reduction in Oyola's occupational base caused by his environmental limitations. See, e.g., Gagnon v. Secretary of Health and Human Services, 666 F.2d 662, 666 (1st Cir. 1981) (remanding because the ALJ failed to consider whether Gagnon's nonexertional limitations, which included environmental restrictions, limited the number of jobs he could perform). This approach basically reflects the approach taken in the Social Security Rulings discussed below, which consider specific nonexertional limitations and, at least for some restrictions, state whether few or many jobs at a given exertional level are affected by those limitations. Other circuits also appear to take a more quantitative approach in determining the effect of environmental restrictions on a claimant's occupational base. See, e.g., Allen v. Secretary of Health and Human Services, 726 F.2d 1470, 1472 (9th Cir. 1984) (remanding because there was no evidence in the record that there were a "significant number of sedentary jobs" which the claimant could perform despite his ability to work only in environments free of respiratory irritants); Asher v. Bowen, 837 F.2d 825, 827-28 (8th Cir. 1988) (remanding because the ALJ could not assume that the majority of unskilled sedentary jobs took place in a pollution-free environment in light of regulations and caselaw suggesting that 85% of such jobs are in machine trades and benchwork categories often involving exposure to respiratory irritants); Ellison v. Sullivan, 921 F.2d 816, 820 (8th Cir. 1990) (the reduction in the claimant's functional capacity for sedentary work because of his environmental restriction was significant because it rendered the claimant able to perform only half the jobs in the occupational base); Zalewski v. Heckler, 760 F.2d 160, 165 (7th Cir. 1985) (the claimant's antisocial personality did not significantly affect his capacity to do sedentary work because regulations indicated that 85% of such jobs were in machine trades and benchwork categories that would not require much interaction with others).
 
 
 15
 In the absence of other helpful measures of the number of jobs Oyola is precluded from performing given his restrictions, we turn to the assessments offered in the Social Security Rulings. Ruling 83-14 is the most applicable because it discusses cases like this one in which both exertional and nonexertional limitations exist. The Ruling states that "[r]elatively few jobs in the national economyonomy require ascending or descending ladders and scaffolding." See SSR 83-14, reprinted in [Rulings 1983-91] West's Social Security Reprinting Service, at 43.[8] Although that statement applies to the larger job base existing for work at all exertional levels, the Ruling also makes clear that the effect of that restriction on the occupational base at the medium exertional level is insignificant:
 
 
 16
 In jobs at the medium level of exertion, there is more likelihood than in light work that such factors as the ability to ascend or descend ladders and scaffolding, kneel, and crawl will be a part of the work requirement. However, limitations of these activities would not significantly affect the occupational base.
 
 
 17
 Thus, the Ruling suggests that a climbing restriction would not affect a significant number of jobs, and so we assume that Oyola would not be precluded from performing a significant number of jobs by the unprotected heights restriction. Since it is unclear, however, how Oyola's additional restrictions against driving and being near moving machinery would affect his occupational base, ultimately the Ruling does not substantiate the ALJ's conclusion that Oyola's restrictions did not significantly reduce his occupational base.[9]
 
 
 18
 The Secretary points to Social Security Ruling 85-15 as substantial evidence for the ALJ's finding that Oyola's nonexertional limitations do not significantly diminish his occupational base. That Ruling states that "[a] person with a seizure disorder who is restricted only from being on unprotected elevations and near dangerous moving machinery is an example of someone whose environmental restriction does not have a significant effect on work that exists at all exertional levels." See SSR 85-15, reprinted in [Rulings 1983-91] West's Social Security Reporting Service, at 351. As Oyola points out, this statement does not take into account his additional restriction against driving.[10] In this connection, however, Ruling 83-10, which discusses the Grid, is relevant. That Ruling defines medium work in part as follows:
 
 
 19
 A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time.... However, there are relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times ... but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semiskilled jobs). In most medium jobs, being on one's feet for most of the workday is critical.
 
 
 20
 SSR 83-10, reprinted in [Ruling 1983-91] West's Social Security Reporting Service, at 30. Thus, this Ruling indicates that there are fairly few jobs at the medium exertional level which require the worker to drive, and that most medium jobs entail standing for most of the workday. Moreover, the examples the Ruling gives of driving jobs that exist at the medium exertional level are all semiskilled jobs which would not be included in Oyola's occupational base in any event since the Grid Rule in question applies only to unskilled work.[11] Once again, however, although this Ruling suggests that the driving restriction by itself would reduce Oyola's occupational base only marginally, if at all, it gives no indication what effect that restriction has when combined with Oyola's other environmental restrictions. Therefore, we conclude that the Rulings indicate or strongly suggest only that Oyola's environmental restrictions, individually, would not significantly reduce his occupational base. However, they do not support the ALJ's conclusion that Oyola's combined limitations would not significantly reduce his occupational base.
 
 
 21
 Our conclusion means that the ALJ could not rely exclusively on the Grid to support his decision that Oyola's nonexertional impairments did not significantly erode his occupational base. It does not mean, however, that the ALJ was required to consult a vocational expert to obtain evidence on that point. The Rulings make clear that, in "relatively simple" cases, an ALJ may consult the vocational publications listed at 20 C.F.R. §§ 404.1566 and 416.966 to determine the extent to which additional nonexertional limitations not considered in the Rulings affect a person's occupational base. See SSR 83-14, supra, at 45; SSR 85-15, supra, at 346; SSR 83-12, supra, at 37; see also SSR 85-15, supra, at 352 (where the environmental restriction falls between "very little" and "excessive," an ALJ would usually need to consult occupational reference materials or the services of a vocational specialist) (emphasis added); cf. Gray v. Heckler, 760 F.2d 369, 371-72 (1st Cir. 1985) (per curiam) (although the court notes that it would be "preferable" to elicit vocational testimony to show that the claimant could return to the "type" of work he had previously performed, the court approved the ALJ's reliance on vocational publications to establish that fact).
 
 
 22
 We think that this case is a "relatively simple" case for two reasons. First, although we do not know the combined effect which Oyola's particular nonexertional limitations have on his occupational base, the Rulings indicate or strongly suggest that, individually, they would not significantly reduce that base. Moreover, the unprotected heights and driving limitations would probably have very little effect at all on the number of jobs Oyola could perform at the medium exertional level. See SSR 83-14, supra, at 43 ("relatively few jobs ... require ascending or descending ladders and scaffolding") (emphasis added); SSR 83-10, supra, at 30 ("relatively few occupations ... require exertion [at the medium level] ... but are performed primarily in a sitting position, e.g., taxi driver, etc.") (emphasis added). Accordingly, it seems more likely than not that, when combined with the moving machinery restriction, those nonexertional impairments would not significantly erode Oyola's occupational base, suggesting that this case should be classified as a "simple" case under the Rulings.
 
 
 23
 Second, apart from the question of Oyola's nonexertional impairments, Rule 203.25 of the Grid would have directed a conclusion of not disabled because Oyola could be expected to make a vocational adjustment to medium work. That is to say, Oyola's vocational attributes fit precisely the vocational criteria of the Rule-that the persons as to whom it would direct a finding of not disabled are "younger individuals" whose education is "limited or less" and whose previous work experience was "unskilled". Consequently, this case is certainly a "simpler" one than a case in which a Grid Rule should not be applied both because nonexertional limitations exist and because the claimant's vocational profile is different than that assumed by the Rule. Cf. Ortiz, supra, at 890 F.2d at 524 ("Whether by so invoking the Grid as a 'framework,' the Secretary can satisfy his burden under step five without resorting to vocational evidence depends on how closely the claimant's characteristics and the Grid criteria overlap.") (emphasis added). In this connection, we note that Oyola's characteristics did not place him near the disabled/not disabled dividing line under the Grid rules. See id. at 528; Rule 203.25.
 
 
 24
 Accordingly, we think that this case is a relatively simple case, and that the vocational publications listed in the regulations may substitute for vocational expert testimony to establish that specific jobs exist in significant numbers in the national economy which Oyola could perform given his restrictions. The vocational publication relevant to this case is the Dictionary of Occupational Titles published by the Department of Labor, which is listed at 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1).
 
 
 25
 The record contains "Supplemental Rationale" reports by two disability examiners-Belen Sampayo, who denied Oyola's application initially, and Salvador Toro, who denied Oyola's application upon reconsideration. Although concluding apparently that Oyola could perform heavy work,[12] an assumption that does not affect our analysis here, Sampayo and Toro each listed three jobs described in the Dictionary of Occupational Titles which could be performed by Oyola and which they stated were available in the national economy, for a total of six such jobs:
 
 229.587-018 Ticketer (textile)
 369.687-018 Folder (laundry)
 795.687-014 Sample mounter (any industry)[13]
 920.687-126 Marker (any industry)
 920.687-166 Shoe Packer (boot and shoe)
 920.687-178 Stenciler (any industry)
 
 26
 The descriptions of those jobs in the Dictionary of Occupational Titles are consistent with work which Oyola could perform given his exertional and nonexertional restrictions. See U.S. Department of Labor, I Dictionary of Occupational Titles (rev. ed. 1991), at 205, 266, 267; II Dictionary, at 842, 937, 938; App. B, C. The jobs are all at the "light" exertional level, and thus within Oyola's exertional capacity. See 20 C.F.R., Pt. 404, Subpt. P, App. 2, Rule 203.00(a) ("The functional capacity to perform medium work includes the functional capacity to perform sedentary, light, and medium work."). The general educational development required to perform the jobs is low, and would appear to be appropriate in light of Oyola's fifth grade education.[14] All of the jobs require minimal retraining, i.e., instruction beyond a short demonstration, but lasting no more than one month. None of the jobs requires climbing and balancing or exposure to any hazards.[15]
 
 
 27
 Only one aspect of the job descriptions in the Dictionary of Occupational Titles requires further discussion. The description for the folder, sample mounter and marker positions appear to require work with machines: a folder "[m]ay" use a "button-sewing-" or "button-attaching machine"; a sample mounter may apply adhesives by "holding material against [a] rotating saturated brush, or feeding part between saturated rollers"; and a marker "[m]ay" use a "tag dispensing machine" to attached gummed labels to merchandise. However, these "machines" do not appear to be the kinds of dangerous moving machines which Oyola must avoid. The sixth number in each of the title numbers given in the above list is "7". According to Appendix B of the Dictionary of Occupational Titles, that number means that those jobs require workers to use "body members, handtools, and/or special devices to work, move, or carry objects or materials," whereas jobs involving "machines or equipment" carry other numbers in the sixth place. See II Dictionary, App. B, at 1005-07. Consequently, the machines used in the folder, sample mounter and marker jobs appear to be hand-or foot-operated (e.g., like a household sewing machine or a grocery store price tag dispenser). Thus, a worker suffering a seizure would not only not be endangered by the machine, but most likely the machine itself would stop operating once the worker suffers a seizure because his hand or foot would be removed from the controls. Cf. also Lizotte v. Secretary of Health and Human Services, 654 F.2d 127, 130 (1st Cir. 1981) (the ALJ determined that the claimant could not work around hazardous machinery, but would be able to perform the job of "marker machine operator in a shoe factory").
 
 
 28
 Lest there be any doubt, however, that the folder, sample mounter or marker positions would be appropriate for Oyola, we do not rely on those positions in rendering our decision. The remaining three jobs-ticketer, shoe packer and stenciler-do not involve any machinery, and would provide ample evidence that specific jobs exist in significant numbers in the national economy which Oyola could perform. See, e.g., Lizotte, supra, 654 F.2d at 130 (affirming an ALJ decision that the claimant could engage in substantial gainful activity where the decision was based on vocational expert testimony that the claimant could perform three named jobs); see also Arce Crespo v. Secretary of Health and Human Services, 831 F.2d 1, 3, 5 (1st Cir. 1987) (per curiam) (affirming an ALJ decision denying benefits where the decision was based on vocational expert testimony as to four jobs which the claimant could perform; the vocational expert relied in part on the description of the jobs found in the Dictionary of Occupational Titles ).
 
 
 29
 Although the ALJ did not specifically refer to the jobs listed by disability examiners Sampayo and Toro to support his decision, at the outset of his opinion he stated that he had "carefully considered all the documents identified in the record as exhibits,...." Exhibit C-8 includes the "Supplemental Rationale" reports listing those jobs. In Geoffrey v. Secretary of Health and Human Services, 663 F.2d 315 (1st Cir. 1981), we considered an argument that the ALJ should have listed specific jobs to show that the claimant could perform substantial gainful work. In dictum, we noted that the record contained the names of several occupations which the claimant could perform. Under the circumstances, we saw no need for the ALJ to repeat those occupations in his decision, but we also said that they represented "a fair example of the type of light work the records show Geoffrey can engage in" and that the listing "demonstrate[d] ... that the record is not entirely devoid of evidence in this respect." Id. at 319 & n. 8. Thus, we suggested that evidence of specific jobs in the record could be given some weight upon appeal even if the ALJ had not relied upon, or even mentioned, that evidence in his decision. Here, at least, the ALJ made clear that he had reviewed the disability examiners' reports, and may also have been influenced by them in finding that Oyola was not disabled from engaging in substantial gainful work, even if he did not refer to them specifically.
 
 
 30
 Obviously, it would be preferable to require an ALJ to describe specifically all evidence which supports his decision that a claimant is not disabled from engaging in substantial gainful employment. Nevertheless, under the circumstances present here,[16] it makes no sense to remand solely to call a vocational expert to testify as to the existence of jobs that Oyola may perform when at least three appropriate jobs are already named in the record. Therefore, we find that the Secretary has met his burden of proving that Oyola's exertional and nonexertional impairments did not disable him from engaging in substantial gainful employment.
 
 
 31
 The decision of the district court is affirmed.
 
 
 
 [1]
 The ALJ did not resolve certain slight differences in the staff physicians' assessments of Oyola's climbing and balancing abilities. For purposes of our analysis in this opinion, we adopt the more restrictive assessment offered by Dr. Hernandez, which would be more favorable to Oyola, that Oyola should never engage in work requiring any climbing or balancing
 
 
 [2]
 The ALJ gives 1989 as the year ending the adjudicatory period, but it is clear that he meant to say 1988 because that is the year Oyola's coverage expired
 
 
 [3]
 The English translation of Dr. Rivera's assessment, which had been written in Spanish, gives 1985 as the date of her report, and for that reason Oyola cites it as evidence of his disability prior to expiration of his coverage. The original document appears to give 1989 as the date it was prepared, although the final numeral was hastily written and cannot be said definitively to be a "9". Nevertheless, the record shows that Dr. Rivera did not begin to treat Oyola for epilepsy until 1989, and so the date on her assessment of his condition could not have been 1985 as Oyola suggests
 
 
 [4]
 The ALJ does not explain what hazards Oyola encountered in his previous jobs, but the record shows that his most recent job involved work with a machine called a "stacker" and that an earlier job may have entailed some driving of the trucks which it was his job to load
 
 
 [5]
 The ALJ's finding that Oyola met those criteria was supported by substantial evidence. Based on Oyola's testimony as to his age at the hearing, Oyola would have been 40 years old or younger when his coverage expired, and thus was a "younger individual." See 20 C.F.R. § 404.1563(b) ("[i]f you are under age 50, we generally do not consider that your age will seriously affect your ability to adapt to a new work situation."). Since Oyola had finished fifth grade, his education was "limited or less." See id. §§ 404.1564(b)(2), (3) (a limited education is one between the seventh and eleventh grades; a marginal education would be formal schooling to the sixth grade level). In his previous jobs, Oyola loaded and unloaded pipes and helped dig holes in which to lay them; he cleaned gasoline tanks, washed trucks, painted gasoline pipes, and stacked drums; and he lifted, moved and stacked blocks, using his hands, wheelbarrows and a stacking machine, and also performed maintenance work. This work would appear to be unskilled work, as found by the ALJ. Cf. id. § 404.1568(a) (unskilled work requires little or no judgment to do simple duties that can be learned in a short time on the job, e.g., handling, feeding and offbearing, and machine tending). Although the ALJ found that Oyola could not speak English and the inability to speak English may point to disability for some individuals at some exertional levels, an ability to speak English is not relevant to the disability determination in Table 3 of the Grid, in which Rule 203.25 is located. See 20 C.F.R. Pt. 404, Supbt. P, App. 2, § 203.00 & Table 3
 
 
 [6]
 The ALJ appears to have taken this approach. On the basis of his discussion of the severity of Oyola's alleged impairments, he concluded, without further support, that Oyola's "capacity for the full range of medium work was not significantly compromised by his non-exertional conditions prior to the expiration of his coverage." See Finding No. 12
 
 
 [7]
 Oyola's climbing and balancing limitations are essentially equivalent to the environmental restriction that he not be exposed to unprotected heights. The conclusions of Drs. Marxuach and Hernandez regarding those limitations are supported by the record only to the extent that they are heldto derive from Oyola's epileptic condition. That is, there is no evidence in the record that, physically, Oyola cannot climb or balance. Oyola's epileptic condition would create a problem for him in climbing and balancing terms only when he actually suffers a seizure while climbing to or balancing at heights. Consequently, we treat those limitations as subsumed in the requirement that Oyola not be exposed to unprotected heights. If only climbing and balancing restrictions based on Oyola's physical capacities were present here, the Perez Torres type of analysis would be adequate
 
 
 [8]
 The "ascending or descending ladders and scaffolding" restriction reflects the climbing restriction placed on Oyola. The residual functional capacity forms filled out by Drs. Marxuach and Hernandez show climbing to involve "ramp/stairs" and "ladder/rope/scaffolds."
 
 
 [9]
 Ruling 85-15, discussed next, also discusses a climbing and balancing restriction, stating that: "Limitations on climbing and balancing can have varying effects on the occupational base, depending on the degree of limitation and the type of job.... These activities are required more in some jobs than in others, and they may be critical in some occupations. Where a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work." (Emphasis added.) Like Ruling 83-14, this Ruling suggests that Oyola's restriction against climbing and balancing-equated here with the unprotected heights restriction-would not significantly diminish Oyola's occupational base, but it is not dispositive. First, Oyola does not just have "some limitation" in his ability to climb and balance, but is completely prohibited from those activities. Second, Ruling 85-15 applies only to claimants with no exertional impairments. Thus, its starting point is the larger universe of jobs existing at all exertional levels. A prohibition against climbing and balancing may well implicate a smaller percentage of that occupational base than it would the smaller initial base of jobs comprising work at the medium level of exertion
 
 
 [10]
 And, as noted in the preceding footnote, the Ruling applies to the larger base of jobs existing at all exertional levels, rather than the smaller base of jobs existing at the medium exertional level, so that the effect of a restriction on unprotected elevations and moving machinery might be insignificant for jobs existing at all levels, yet significant for jobs only at the medium exertional level
 
 
 [11]
 See SSR 83-10, supra, at 27 ("The RFC addressed in a [Grid] rule establishes the presence of an occupational base that is limited to and includes a full range (all or substantially all) of the unskilled occupations existing at the exertional level in question.") (Emphasis added.)
 
 
 [12]
 Sampayo and Toro both used Grid Rule 204.00 as a frame of reference for their decision. That Rule applies to persons who can perform heavy work despite their severe medically determinable impairments. We see no problem arising out of Sampayo's and Toro's and the ALJ's different evaluations of Oyola's exertional capacity. The ALJ determined that Oyola's alleged pain constituted an exertional impairment that reduced his functional capacity to the medium exertional level. In doing so, he relied upon Oyola's testimony at the hearing, evidence which was not before Sampayo or Toro, who made their decisions before the hearing on the basis of the medical records alone. As already noted, those records would have supported a conclusion that Oyola did not suffer pain between February and December 1988 to a degree that would have affected his exertional abilities
 
 
 [13]
 The title given in the Dictionary of Occupational Titles under this number is "gluer," but "sample mounter" is given as an alternate title
 
 
 [14]
 The second lowest reasoning level is assigned to the ticketer, folder, marker, and shoe packer jobs. That level would require Oyola to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions"and to "[d]eal with problems involving a few concrete variables in or from standardized situations." The lowest reasoning level applies to the sample mounter and stenciler jobs, and requires application of "commonsense understanding to carry out simple one or -two-step instructions" and the ability to deal with "standardized situations with occasional or no variables...." The lowest language level is assigned to all but the ticketer job, and would require Oyola to "[p]rint simple sentences containing subject, verb, and object, and series of numbers, names, and addresses", and to "[s]peak simple sentences, using normal word order, and present and past tenses." The second lowest language level applies to the ticketer position, and would require Oyola to be able to read "adventure stories and comic books, ... [and] instructions for assembling model cars and airplanes", to "[w]rite compound and complex sentences," and to "[s]peak clearly and distinctly with ... correct pronunciation, ... using present, perfect, and future tenses." All of the jobs require only the most rudimentary mathematical skills, e.g., the ability to add and subtract only two digit numbers, to perform some multiplication and division, to use money and to measure with units like the cup, pint, quart, inch, foot, yard, ounce and pound
 
 
 [15]
 The Guide for Occupational Exploration ("GOE") numbers given the jobs in the Dictionary of Occupational Titles are cross-indexed in a companion volume prepared by the Department of Labor entitled Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles (1981), the use of which we approved in Gray, supra. That volume classifies the physical demands of jobs (sedentary, light, medium, etc.), and breaks jobs down into the types of physical activities they entail. All of the jobs listed above are coded as "4", meaning that they require "reaching, handling, fingering, and/or feeling." Selected Characteristics, at 75, 210, 212-14; App. A, at 465-66. (A sample mounter is also required to have good visual abilities.) Id. at 210; App. A, at 466. None of the jobs is characterized as requiring climbing or balancing. The Selected Characteristics volume also describes environmental restrictions associated with certain jobs. Of all the jobs listed above, only the folderposition has an environmental restriction. Coded as "4", it involves work in a wet and humid environment, an environment in which Oyola could work. Id. at 212, 467, 479
 
 
 [16]
 Given the evidence in this case we would have sustained a decision by the ALJ rendered consistent with the regulation at 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e)(2). In that regulation the Secretary provides for the following analytical procedure for determining whether an individual with both exertional and nonexertional impairments is disabled: (1) The decisionmaker is to see whether the individual is disabled based on strength limitations alone. Here, Oyola was not disabled because he retained the ability to do medium work. (2) The decisionmaker is to consider the relevant Grid Rule as a "framework." Rule 203.25 being used as a framework, Oyola's residual functional capacity, age, education and work experience all indicated that he was not disabled. (3) Finally, the decisionmaker is to consider "all of the relevant facts in the case" as described in the regulations, including the adjudicative weight accorded such factors. Here, the evidence showed that only Oyola's epilepsy and pain could be characterized as medically determinable severe impairments, but that his epilepsy did not meet the criteria of the Listings, indicating that he was not per se disabled from engaging in substantial gainful employment. See 20 C.F.R. § 404.1525(a). The evidence also showed that he had not sought or followed consistent treatment for his conditions, important failures under the regulations and case law. See id. § 404.1530; Irlanda Ortiz v. Secretary of Health and Human Services, 955 F.2d 765, 770 (1st Cir. 1991) (per curiam) (lack of sustained treatment bolsters decision that the claimant was not disabled); Tsarelka v. Secretary of Health and Human Services, 842 F.2d 529, 534 (1st Cir. 1988) (per curiam) (the claimant should have secured treatment to show that her ability to work could not be restored). In addition, the Rulings indicate or strongly suggest that, individually, Oyola's nonexertional limitations would not significantly affect the full range of medium work he could perform. Those Rulings further indicated that, here, the Secretary could rely on the Dictionary ofOccupational Titles for vocational evidence that specific jobs which Oyola could perform existed in significant numbers in the national economy, and the record contained specific job titles, whose descriptions matched Oyola's exertional and nonexertional limitations